Our second case is 24-2048 Hall v. Sheppard Pratt Health System, Inc. Ms. Craft, whenever you're ready. Thank you, Your Honor. May it please the Court, I reserve seven minutes for rebuttal. This case is on a motion to dismiss. I'm sorry, not a motion to dismiss, a motion for summary judgment. I'm so sorry. I got too caught up in the last argument, I guess. You won't do that. This is a different case. I know, I know. I've got to clear my head. This case is about whether Sheppard Pratt violated Title VII when it refused to accommodate Ms. Hall's sincerely held religious objection to the COVID-19 vaccine and terminated her. She, the record is clear, she made her prima facie case. She held a sincere, she had a sincerely held religious belief against the vaccination. The conflict was that by taking the vaccination, it would conflict with her religious beliefs. The requirement was that she take the vaccine in order to continue working, and she was terminated. The issues for this Court to hear are whether Sheppard Pratt failed to engage in the accommodation process, whether they failed to accommodate her at all, and whether in doing so they, or in not doing so, they proved that it would be undue hardship on their part. The main argument would be following Groff v. DeJoy, that an employer must show, and I read show to mean prove, that a substantial increase, cost, or burden would be borne in relation to its business if they accommodated this one request. We're not talking about how they would accommodate 20 requests, 50 requests, 3,000 requests. I'm sorry, you got that out of Groff, that an employer can't aggregate the burden of granting all of it, because I didn't see that in Groff. I think that they can, in terms of relating if there were employee objections, if there were issues that were specific to that business, they might be able to, but the first step is how does it impact this first individual? Can we accommodate this individual? And if it would be an undue burden to do so, then we don't have to. How do we escape not looking at the aggregate effect here? You've got numerous people who are seeking this exemption. How do you just focus on an individual in a setting such as this when you're talking about patient health and safety? And I think those are fact issues that should be determined by a jury rather than as a matter of law. What evidence do you think is in the record that would allow a jury to find that granting an exemption to people comparably situated to your client who work face-to-face with especially frail patients and with other people who then work with those especially frail patients, what's the evidence in the record that that would not impose a very substantial safety risk in a hospital environment? Again, what the other side has cited is the generalized state of the world at that specific time. Right, like germ theory and everything. Which we understood. But what Title VII requires you to do is to take a look at what are this person's duties and how can they be accommodated, or would any of those accommodations cause an undue burden? And I think Shepard Pratt, the evidence shows that they jumped to, well, she's patient-facing. They didn't look at how long she was patient-facing. They didn't look at how they could redesign her job. I thought they absolutely did. The first step was they consider whether it would be possible to do this job remotely so that you wouldn't... They considered whether they could do the job completely remotely. And the answer was the majority can be done remotely. There's a portion that can't. They didn't say is there somebody else that can do that job, the non-remote job. And I think that's part of the discussion. How can we accommodate you? She wasn't a full-time worker. So if there was something that her hours needed to be cut a little bit, or there were other things that could have been considered that weren't. It was simply... The other thing that I want to make clear is that the record does not, contrary to what the district court judge opined, the record does not show that she had substantial face-to-face interaction with patients. It's very much to the contrary. For 18 months up until the time that they said you need to be vaccinated or you're going to be fired, she practiced social distancing when she did those admissions. She did everything on the computer. She did the initial work on the computer, checking insurance on the computer, doing all of her job with the exception of the person who's going to be admitted into the hospital, coming into the lobby and standing six or more feet away at a time when the lobby did not have anyone else, and it could be confidential, it could be quiet. She did her job with no issues. There's no record that supports that she infected anyone, that she caused any disruption in work, that her coworkers were concerned that because she wasn't vaccinated, she followed all of the CDC guidance in testing, masking, and social distancing. I feel like you've got kind of an uphill climb just given the way the case law has developed. It does seem that most courts of appeals have concluded that when it comes to people who work in hospitals and health care facilities, it really would have been an undue hardship to make exemptions. And some of those cases include, I know in the Sixth Circuit, and I'm blanking on the name, but it was a pharmacist, someone who had no direct contact with patients, but had direct contact with other people who then had direct contact with patients. And I just, I mean, are there any cases in the health care context? Yes. There's one recent case out of the District of Maryland, actually, that survived summary judgment that is now moving on to trial. It was a, it is ANORU, the MedStar. And in that case, the decision at summary judgment was that the medical facility had not proven that this person was a safety risk. They gave very generalized safety concerns. What kind of job did the person have? I mean, I'll find the case, but I'm just curious. In ANORA, I'm not sure that I have the information. I'll find it. It's fine. Sorry, I don't want to hold you up. That's okay. That's a case that's in Maryland you're saying right now that's going into trial? Yes, it was decided. Which we ultimately may be reviewing to determine everything you're saying, whether or not it's correct. Do you think that's going to be helpful to us right now? I think if we say anything, it possibly could be picked up if we're commenting on that case. I don't think that's appropriate. Do you? Oh, that if you say something about my case, that it will somehow. . . The one that's down in Maryland that has survived summary judgment is now about to be trialed, which may be likely an appeal to us. Possibly. Possibly. Well, it's going to a jury. Those questions that I'm saying to you that are fact questions, that should be. . . But that's not our case. We didn't say that. The district court said that. No, but she was asking if there were any cases in the medical setting. I think that when we ask that, we're talking about appellate cases. Preferably our cases or the Supreme Court cases or at least something from another circuit. Forgotten. You are correct in that the consensus seems to be the bright line rule that if there is safety, if the defendant brings up safety as a concern, then it's an automatic, we don't have to accommodate you. I didn't think the line was that bright. I did not think the rule was that bright line. I thought it was more in the context of a health care facility with vulnerable patients. From all of the cases that I've read that have gone to the circuit courts there that deal with health care, safety is the issue. It becomes a bright line rule that if you're in the field of safety, it doesn't matter if you're a respiration therapist or an occupational therapist. If they determine, if the entity determines that it would be an undue burden to accommodate you and they cite safety, then it's a bright line that you're not going to be accommodated. You're going to be terminated. I think that's a dangerous thing to do because it doesn't take into consideration the accommodation process. It doesn't take into consideration what could she have done, what couldn't she have done. How could she have been accommodated? Where was that conversation? It's not in the record. Did they offer her? I'm just sort of surprised to hear you emphasizing kind of the accommodation process and dialogue because it honestly looked to me like this hospital had almost like a model policy where first they consider is it possible to do the job remotely, and if it's not, they invite people to transfer to a position that can be done remotely, and then they make really clear, look, if we ever change our policy, you're welcome to come back. It seems like a pretty, what's missing from this? What's missing on this is the practicality of it. On paper it may look that way, but the question is can you do the job remotely, and if it's not, there was no question of how can we redesign this so that it can be done. She's the admissions coordinator. She was one of the admissions coordinators. Okay, but how does an admissions coordinator do the job if they're not there when the patients are admitted? It would be a fact question during that deliberative process, during that process of having a conversation. They had the process, and they concluded after their process, actually we want the admissions coordinator to be there for admissions. So instead, we're going to offer you the opportunity to transfer to another job where you don't have to be there, and she said no. She applied for jobs or looked for jobs, and all of the jobs required the vaccination. I thought it was in the record, but tell me if I'm wrong. I thought it was in the record that some people who had objections did transfer to other jobs that could be done remotely, and at that point they got an exemption. But if that's not in the record, correct me. The record, I'm not sure if that's fully in the record. The people who were granted the exemptions were people who were already working remotely, so they already had the model that they could be working remotely, which they hadn't tried in either a hybrid manner or any other manner for my client. I think I'm just about out of time, so unless there are any other questions, I'll reserve the rest of my time for rebuttal. Thank you, Ms. Craft. Mr. Bergen. Good morning, Your Honors. May it please the Court. Paul Bergen on behalf of Applee Shepherd Pratt Health System, Inc. I'm here today asking you to affirm the district court's grant of summary judgment. Appellant was the admissions coordinator at Shepherd Pratt Health Center's Center for Eating Disorders. She had face-to-face contact with the hospital's most medically vulnerable patients and other employees who, in turn, had contact with those patients. The appellant was denied a religious exemption to Shepherd Pratt's COVID-19 vaccination policy, which was enacted following a state mandate and during a surge of cases due to the highly contagious Delta variant. Were there any exemptions, religious or medical, that were in fact approved for the Center for Eating Disorders? Your Honor, the Center for Eating Disorders did not approve any medical or religious exemptions. The general hospital system was able to approve some medical and religious exemptions under different factual circumstances and scenarios, but there were none approved at the Center for Eating Disorders. So your client, Shepherd Pratt, makes a determination that affects patient health and safety. How do we – how does that evidence, or at least that statement, to what extent do we give deference there or are required to give any deference to that determination by a health care employer? Yes, Your Honor. So at the time, given the state of the pandemic, the CDC guidance and data was overwhelmingly stating that transmission and infection of COVID-19 was heightened when it came to unvaccinated individuals. They were more likely to infect and transmit COVID-19. When it comes to Shepherd Pratt's determination for patient safety requirements, it looked at the scientific evidence available to it at the time regarding transmission and infection. It looked at the medical status of the individuals that it served, most of which are medically compromised and more susceptible to illness, severe illness and death from COVID-19. And it made a determination that it was obligated to put the health and safety of its patients first and foremost, and mitigating the risk as much as it was able to regarding the potential for infection on its hospital units. Did the center have completely remote positions and were those individuals also subjected to the vaccine requirement? So, Your Honor, when it comes to the medical hospital as a whole, the 322-bed medical hospital, there were remote. Some individuals did work remotely. The remote individuals, if they could perform their position remotely, they were granted exemptions to whether it was a medical or a religious exemption. The hospital also looked to see whether the essential functions, there might be an in-person position, but if there was a determination that the essential functions of the position could be performed remotely, then they would grant an exemption for remote work. I know of some instances where there were therapists, for example, who didn't have direct patient care insofar as they were injecting patients, taking vitals, it was more so talk therapy. And so they permitted some of those individuals to perform the jobs remotely. Billing, people who were in the billing department, they might have worked in person, but those were functions that could be performed remotely. So there was a wholesome look at the jobs, duties, and individualized inquiry, and if the essential functions could be performed remotely, then accommodations were made. But if the essential functions were required to be performed in person, then they had to look at potential alternatives such as transfers and things of that nature. Do you know the answer to Judge Harris's question about whether or not Ms. Hall was offered the opportunity to take on a remote position and she declined it? Ms. Hall was offered the opportunity to search for remote positions that were able to accommodate her in an unvaccinated state. Ms. Hall did not apply to any or express any interest in any of the vacant positions at Shepard Pratt, and nor has she reapplied for employment at Shepard Pratt. And her answer was she didn't do so because they required the vaccine. Well, what she didn't do is she didn't inquire with regard to any particular position. You know, is this a position that can be performed remotely? The vaccine requirement applied system-wide, but to the extent that there was a position open that could have been performed remotely, she was more than welcome to express interest, reach out to recruiting, apply, but she declined to do so for any of the hospital's vacant positions. As I understand it, there were over 200 of these requests for this religious exemption, about 100 or so for the medical one. Does that affect the determination of whether there's an undue burden on the employer to any extent as opposed to maybe you had one or two that were requested? Yes, Your Honor. I believe the case law is very clear that an employer is permitted to look in the aggregate of the aggregate effects or the cumulative effects of granting any particular accommodation. What case are you referring to? I believe Hardison states that with regard to aggregate effects there. Hardison states that the EEOC guidance states that together employers versus Mass General Brigham, Inc., which is a District of Massachusetts case in 2021, which was affirmed by the First Circuit subsequently. There's some cases out of the District of Oregon, Lavelle-Hayden versus Legacy Health as another example. Do you have anything in this circuit where you've said that? I don't know offhand, Your Honor. Just another question on this sort of aggregate effect. Do you need that to prevail? Is it your position that the undue hardship here came from the aggregate effect, or do you think it would have been an undue hardship just to grant this one exemption? Your Honor, I don't believe that we need that to prevail. I believe the undue hardship came from granting this one exemption. The appellant worked face-to-face with the hospital's most medically vulnerable patients. The center for eating disorder patients were often very medically compromised. Some of them arrived to the center for eating disorders in ambulances unable to walk. So these were medically compromised individuals who are more susceptible to severe illness and death due to COVID-19. I also think that it's important to note what happens if there is a positive case on any of these units. If there's a positive case on any of these units, then the unit has to go into outbreak status. When the unit goes into outbreak status, the positive individual is put into a room of isolation. Isolation exacerbates eating disorders and mental health conditions, which are the very conditions that these individuals are going to Shepherd Pratt to receive treatment for. When a unit is also on outbreak protocol, communal and group activities cease. In the mental health treatment context, communal and group activities are vital to the therapy that Shepherd Pratt renders. A unit being on outbreak status significantly undermines the treatment that these individuals are coming, sometimes from across the country, to Shepherd Pratt to receive. Many of the individuals, especially those who voluntarily admit themselves to the Center for Eating Disorders, have failed treatment at numerous other facilities and come from across the country to Shepherd Pratt to obtain that treatment. When there is a positive case on the unit, not only do the patients suffer from the potential of the effects of the virus itself, but it also undermines the treatment and potentially exacerbates the conditions that they're seeking treatment for, which in and of itself is an undue hardship. Can I ask you a question about what hardships we're supposed to be looking at here? This is a fairly unique circumstance, a pandemic, hopefully once in a generation, never occur again, we hope. The cases seem to focus, at least the cases pre-pandemic, focus primarily on financial costs to the employer, and there wasn't much evidence of what that cost would have been. Obviously there would have been some cost, I suppose, in having to find someone to replace Ms. Hall during the time that she couldn't be there because of any accommodation that might have been given to her. But what about that? Is that a problem that those costs were not quantified? Do you need that in this case? Sure, Your Honor. So I would say in this case we don't need that. The courts have been clear that non-economic costs can be sufficient to constitute an undue burden, health and safety, reputational injury. But I would also say that while there were no quantifiable economic costs cited in the papers, there were economic costs associated with increased transmission of COVID-19 at Shepherd Pratt, one of which is when the center or any particular unit is on outbreak protocol, admissions to that particular unit cease. And so the hospital then can no longer admit patients. And so if beds are sitting empty, that's lost revenue to the hospital system. To the extent that there's increased transmission of COVID-19 that gets to employees and the employees have to, you know, miss work at times, they have to rely on agency coverage, which is more expensive and an added cost. But I would say, Your Honor, that the non-economic costs associated with the potential accommodation were certainly sufficient to constitute an undue burden from the health and safety perspective and the potential reputational injury cited in our briefing. She was in more of an administrative-type position, wasn't she? So many of her job functions, yes, could have been performed remotely. However, it was her- My question deals with what she actually was doing. What kind of work was she doing? So as the admissions coordinator, she walked prospective patients through every step of the admission process. So it started with the first phone call or outreach from a prospective patient. She would coordinate, you know, insurance, coordinate any kind of pre- It seems to me, I don't know, maybe I seem to remember. Maybe you remember that individuals in that position, they sort of put them in a little glass sort of enclosure or something where you could do this. You could have a little opportunity to speak to a patient in front of you, actually in front of you, and deal with it. Was that sort of accommodation something that would have worked here for her? No, Your Honor, that would not have worked. As an initial matter, there's no evidence that- She worked also in person with other employees. So even if she is in a glass enclosure speaking with patients, there's no evidence that that would sufficiently mitigate the risk of transmission to those patients. But as she's transversing the hallways of the building in an unvaccinated state, that increases- It's an airborne illness, so that increases the risk of infection across the units. She shared a small office with another employee, a small 10-by-10 office. So those in-person contacts with coworkers, that is in and of itself sufficient to constitute an undue hardship. The CDC guidance and all the medical guidance available to Shepherd Pratt at that time indicated that it was vaccination that was the most effective infection control measure. Not masking and testing, not social distancing, not the erection of plexiglass or anything like that. The medical consensus was vaccination was the most effective measure. And to that end, her position, her in-person functions with these patients as the admissions coordinator, those were the most essential functions of her job, the actual admitting of the patients. This was not a job where the essential functions could have been performed remotely. While the bulk of her day may not have been spent doing this, just because a particular duty isn't performed necessarily for a significant percentage of time doesn't mean that it's not essential. The EEOC states that you need to look at the totality of circumstances when it comes to a particular accommodation, citing factors such as, is this job performed indoors or outdoors? Is it in a group work setting? Is there in-person contact with the public employees or medically vulnerable individuals? And here all of those boxes are checked. The appellant worked indoors in a congregate living facility. She had close in-person contact to patients, to employees. And I want to state that when it comes to employees, just because they weren't patients receiving care at the Center for Eating Disorders, we don't necessarily know what comorbidities other employees may have had. They may have had heart conditions. They may have had diabetes. They may have been receiving cancer treatment. And so those employees may themselves have been increasingly susceptible to severe illness or death from COVID-19. And they warranted protection as well. Going back to the in-person functions of the position, the appellant established a rapport with these patients. Everything she did in the course of her job led up to the point of getting these patients through the doors admitted to the Center for Eating Disorders. Many were apprehensive about admission. Many struggled with anxiety. This is a monumental and life-changing decision for these individuals to voluntarily admit themselves for this treatment. So the appellant formed a personal bond with these patients, and it was her job upon their admission to in-person greet them, get them in the building, through the doors, to receive the treatment that they need. She used the rapport that she had developed with them, sometimes over a course of months, to soothe those fears, to answer questions, to ease any potential anxieties. This is something that needed to be most effective, to be performed in person with these individuals. Ms. Craft indicated, I think she said, that there was more than one admissions coordinator. Is that right? Yes, Your Honor. She did have a co-worker, and it was the co-worker who she shared a small office with. So would a reasonable accommodation have been to allow that co-worker, I don't know if she also objected to the vaccine, but assuming she did not, to have her take up these primary responsibilities of interacting with patients and let Ms. Hall do the non-patient-facing work? No, Your Honor, and there's a couple reasons for that. One, it is an undue hardship in and of itself to alleviate an employee of the essential functions of their position and put those essential functions onto another employee. So this other employee, she had a full plate of job duties and responsibilities, and then to require her to do not only the in-person admissions that the appellant was doing, but there's also some legwork that's required for each admission, familiarizing oneself with the case. So that time burden in and of itself on this other individual would have constituted an undue hardship. The case law, I believe, is pretty clear that it is not a reasonable accommodation and the employer is not required to eliminate a position's essential job functions. I'll also note that if the other admissions coordinator performed all of the admissions duties, that continuity that I mentioned earlier, that the admissions coordinator is with the patient from the first call, establishing that relationship over a course of months to then be the one there with them in person to greet them, that continuity no longer exists. And so these patients would be seeing a new face when they came to the Center for Eating Disorders for their admission. That continuity was a vital part of the process. So I would say that these essential job functions could not have been adequately shifted to somebody else without constituting an undue hardship. Your Honors, I would also like to say that Shepard Pratt engaged in a very fulsome interactive process. They evaluated each request individually. They had multiple meetings concerning each request. GROF requires the employer to evaluate whether other options are available for potential accommodations, and Shepard Pratt discharged its duty under GROF. It engaged in a very thorough, wholesome, interactive process with every single individual who requested a religious exemption and a medical exemption. It evaluated other options. As I said, it evaluated remote work. It evaluated whether masking, testing, distancing would have been sufficient. It permitted employees to look for other vacant remote positions. It really, really went to great lengths to accommodate as many individuals as possible without compromising any patient safety. So it did engage in an interactive process and certainly did discharge its duty under Title VII and GROF in that regard. Your Honors, if you have nothing further, then I will rest on the papers. Thank you very much. Thank you. Thank you. A couple of points on rebuttal. Nowhere in the record is there a full explanation that tracks with what opposing counsel has said her duties were. The hand-holding, the building a rapport, months and months of interaction with potential inpatient clients. So I'm not quite sure where that argument has come from and how that was an essential part of her job. The essential part of her job, as testified to during her deposition, was clearing insurance, talking to the referral doctor over the phone or over email, contacting, if it was a minor, the parents via email or by phone. If it was an adult, contacting the adult either by phone or by email. Keeping them updated on when a bed would be available and then all of the documents and everything would have been signed beforehand and then meeting them at the lobby to ask if they have any additional questions and to call the nurse to come get the patient for inpatient. I think that your questions raise really good points. It could have been possible to put up plexiglass and have her interact with the patients in that regard. How would the plexiglass work? The same way that it would work at numerous admissions offices that you go into the hospital now, where you go up and you have a little cubby that you go into as the patient and on the other side of the plexiglass is the... So it's like a box, it's not just a divider. I remember when we had dividers, but you're not talking about a divider, you're talking about a box. Well, I don't know what exactly it would be, because again it wasn't considered, but it could be a cubby, it could be a box, it could be dividers, it could be... The other thing that is important to know is that they only admitted maximum of two patients per day and only on Tuesdays and Thursdays. They did not admit patients every week because it was a small floor. They had to wait for a bed to become available. And no two admissions happened at the same time. So is the thrust of your argument that what went wrong here is they should have let her work remotely and then given her an exemption? Is that your argument? Because I didn't even get that from your brief. I thought the argument in your brief was she stood six feet away, what's the big deal? They should have let her not get the exemption and continue to work in person. What is your argument? I think that would have been one of the options, but remote work would have been an option. Any of the other safety precautions that were available would have been an option. Just let her wear a mask and do her job in person. Did you argue? I feel like I'm hearing a different argument today, which is she could have done everything either in a box or remotely. We did make that argument, I believe, that things could have been reworked, at least the discussion of how it would look, that didn't happen with her. I'm sorry, so you did make the argument below, the mistake here where she should have been allowed to work remotely, she didn't really have to be there to greet the patients. I don't think it was quite that clear, because the focus was on the fact that this was a blanket, your job can't be done remotely, we're not going to talk about whether or not it can be adjusted. I think she said in her deposition, I understand my job can't be done remotely. She said in her deposition, I understand that it can't be done 100% remotely. Can I ask you just another question to clarify the arguments that are in play? As I read your brief, you were challenging on appeal only on the failure to accommodate claim and not on the disparate treatment claim. Is that right? Yes, we're addressing the failure to accommodate claim, the disparate treatment only to the extent that there were secular exemptions provided that were not provided for her. That is the disparate treatment claim. You feel you've argued that in your brief? Because I did not see it in your brief. I believe that we did. The only other argument that I wanted to make was the fact that the disruption to the hospital, again this was a very small portion of the hospital, there's no evidence in the record that there ever was an outbreak. I'm sorry, do you have your brief? Where do I find the disparate treatment argument? I can provide that to you. I have the brief.  I can pinpoint that to you. It's all right.  Unless there are any other questions, I'll stand on the briefs. All right, thank you. Ms. Kraft.
judges: Albert Diaz, James Andrew Wynn, Pamela A. Harris